Final case of the morning is 1641431, S.E.C. v. Kahlon, and we'll hear first from Mr. Cole. Good morning, Your Honors, and may it please the Court. The briefing in this case is fairly extensive. I wanted to begin at the end of it and then move back to a couple of broader points. And that point at the end I wanted to begin my remarks with this morning is this question of Mr. Kahlon's status as an accredited investor. As the briefing goes on on the S.E.C.'s side of the issue, they say, well, if anything else, there's issues of proof there. And it is worth taking a moment just to center the analysis of that on what the reg says. It's Rule 501A, Subpart V, you have a natural person with net worth over a million dollars. You have Subpart VI, natural person with income over $200,000 for two years. And Subpart VIII, an entity in which its owners are accredited investors. And the record before the Court is not just undisputed, it is conclusive on this point. My client, Mr. Kahlon, is — The S.E.C. doesn't really dispute that, but the question here is the lateness of that evidence getting before the Court. I think that's what you need to address. Why was it error to rule on the basis of the absence of evidence and not to change by the late — change the ruling by the late offering? Do you agree with that factual scenario, that the evidence came in late? I don't. But let me jump to the end of it and talk about why it's still relevant, even if everything that the Court is concerned about is correct. Remedy in this case is defined by a number of different factors. And a relevant factor on remedy would be substantial compliance. If I was a person who attempted to be an accredited investor and I missed one year, but I made it the other year and I really tried to make it, that's a relevant fact. And at the remedy stage, there is exhaustive proof in this record of Mr. Kahlon's efforts to comply with the regulation and with the requirements of being an accredited investor. The fact is, it's very good evidence, and it removes any doubt about the point that he is an accredited investor. There's not really a clash on those points. If it would be relevant, if I missed a year, got a year, got a year here, to show that there was good faith, that I wasn't a malefactor and a person abusing the revision, it's certainly relevant to show his full compliance. So at the very least, at the issue of remedy, the fact that there's evidence of compliance is extremely probative on that limited point. I didn't see any argument in your opening brief on this. The first time it's mentioned is in the reply brief. We argue remedy at length, Your Honor. No, that your client was an accredited investor. Well, we argue at the beginning of the Statement of Facts he's an accredited investor. It's part of the reasons, that's part of the diligence that he did in building up his business to begin using this exemption. And we talk about remedy in that discussion. I don't know if it's — we don't say he's an accredited investor, therefore, no remedy is appropriate. Why he's an accredited investor and — That's in our Statement of Facts, Your Honor. We cite the — we cite his income statements and we cite some other evidence. It's like the second or third page. There's the declarates. There are a couple of different page numbers I've noted down, but — You might set out the facts, but you don't make the argument in your argument section of your brief. Well, it's — the fact is that — the fact and regulations are cited together. We say, here is what the regulation requires, a certain amount of income. We cite the reg that I just quoted to the Court. And then we cite — the pages begin at page 1689. There's some other pinpoints after that. We cite to the various tax items. And then we cite the provision as to the accredited investor ownership of the entity. And we just — the fact — the fact and law are cited together, and that is the argument. Here is what it requires, and here is what the record indisputably shows. You're supposed to argue your point. You're — I mean, just laying out the facts doesn't do it if you don't make the argument. The record shows — and we cited to the Court the two relevant standards that I just quoted. Next to it, we put what the facts were about that. In the course of remedy, we discussed the man's good faith, how he went about building up his business. But to me, this makes a mockery of the procedural posture of the case to say he's not an accredited investor, because the bar is low enough, and he made some — the amount of money he made alone shows that he's an accredited investor. Your Honor, additionally, going back to the — But, I mean, what the other judges say is not incorrect, but I just think this is a sham argument. I've just barely — there's more answer to this. Going back to the liability stage, I suggest we look at the full record, because it's all here. But let's go back to what's there. That record shows it's not — the complaint says nothing about this. This is not a claim the SEC was pursuing Mr. Callan for. He's given all this information over to the SEC. In our briefing on our motion, we say here's what the regulations require. He complied with that. The standard, of course, secondly, is not simply that he be it. He can also — the issuer can have a reasonable belief that the person is accredited investor. Let's not get into — I really don't think accredited investor is an easy way to get out for us to rule. But, really, I think the meat of the case is in the other elements of the violation of 504b3. I don't know what's happened to my voice. Let me — I will — one last point on this, and I'll move to that, because I want to just close off this question, because there were other questions. The original submissions about Mr. Callan's status talked about the multimillion-dollar property he had in Texas that he acquired well before he began doing any of these transactions. And that multimillion-dollar asset is sufficient to at least raise some fact issue under the argument Judge Jones was just making about his status. But let's — let's talk about the other elements of this — of this exemption and the other doctrines about it that have been cited by the SEC. And let's begin with what is most recently stated by the SEC. I've tried to find a word to describe what has happened with this rule in the last few months, at the beginning of this year. And the word I came to was reiteration. The — when this regulation was first enacted, there were statements made by the Commission and by various spokesmen of the Commission about how it was going to enhance the ability of small businesses to get seed capital. There have been enforcement actions on a number of facts — fact patterns since then. Then we come to this year, and we have a new — we have a reiteration of that regulation with these relevant aspects. They recognize the exemptions there. It doesn't go away. They recognize that following the exemption produces free trading shares. So that ends the — the connection to the registration rules. You have a — you have nothing in the restated, reiterated regulation about this The repeal of a related regulation that did not result in free trading shares, Rule 505, it had a $5 million cap. That rule goes away. The $5 million moves over to Rule 504. Well, you know, that's sort of appealing, but if — but if you're caught — go on 45 in a 30-mile-an-hour zone, you have to pay the fine even if they change the — So I'm not sure that's certainly not determinative. But let me — I mean, I don't like the way the SEC briefed this case, but at the same time, what evidence was there that a single — what is the — what is the connection that makes these unregistered securities? My — or validly, my capital company in a particular state like Texas to take advantage of an absence of an exemption. And then they can sell to you in Texas if they're a Texas issuer to begin with. But I don't see how the person who is purchasing the securities can buy them from China or from Nevada or New York and have it be — even if he lived in Texas, I don't see how, as the purchaser of securities from somewhere else, can claim the benefit of the exemption. But the — of the subparts of B, B-1 contains a connection to transactions within a state or a limitation. What B-1 says is that if you're — the way I interpret these, I think the Bronson case is confusing to me, too. But the way I — and it didn't even bother to cite the whole reg. But as I interpret it, if you issue the securities in a state where there is no regulation or there's an exemption, then you can sell them, then you, Callan, can do what you want with them. If you issue them in some other state where some — there is a connection between the issuance and a state with the — that requires a registration, they can be sold to Callan, and Callan can resell. But I think the — what they're challenging is you're buying securities that are from all over the world, and just because you're in Texas — am I misunderstanding that? Well, the Texas exemption itself — let me start with that and work my way back. The Texas exemption itself has no limit to Texas. It says if the — the registration requirements that otherwise control in this State do not apply if the sales are made to accredited investors as defined by the Federal regs. And that — no, there are other exemptions in Texas. But the relevant one just says that. So Texas, which knows how to put limitations on things, did not do so in that limitation. Then you go back to the broader question of how do these markets work, how do we get the capital there? You get a — did your client get an opinion from the Texas Blue Sky Law Office about that? There is extensive back and forth between his counsel and the securities regulators and officers in the — in the State that's in the — the email traffic about that is in connection with his — is as his declaration filed at the remedy stage. I mean — There's not a formal opinion letter. Well, it's not really in your briefing. I mean, other than all this, you know, stuff about due diligence, but — Well, if — what the site's run back to in his declaration is a series — he discovers it, he investigates it further, and then there's a tick, tick, tick set of emails and other items he gets from the government, including a publication that was available at the time from a lady named Crawford, who was the head of that office, that was circulated around this time explaining exactly what I just said. The limitation in the rule, the only one, and the only one discussed in the Crawford paper about that particular exemption has to do with the intent of the person using the exemption, which is that they cannot be — the language in it is investment intent. It is not a defined term. I'd suggest that by reference to the underwriter provisions and other rules, it simply means you're not an underwriter. You're buying it. You're assuming risk. You're trying to make a profit, which is exactly what my client did. But to the point about the structure of the market, you can — you can, of course, imagine an exemption that is limited just to a State. Texas could say we only want Texas companies. We only want transactions. They didn't say that. So we begin with that plain language. They knew how to do that. But — You say they. You mean Texas didn't say that? The Texas — the Texas exemption. Does it have any authority to regulate the sale of securities anywhere else? They — they have the authority to define how their exemption is written and what they incorporate. They don't have the authority to say anything they have authority to regulate. And when did they get authority to regulate sales from China and Maine and New York? Well, they — they have the authority to say — to say if you want to use our law in this exemption, you may use it subject to these limitations. They did not put a limitation in there about geography. Isn't there a presumption that State laws don't have extraterritorial effects? It depends on the circumstance and the situation. I mean, but — but why would — why would it be limited to Texas if — they — you can't — it couldn't imply an intent to govern everything that happens in the New York market. Well, at some point, there has to be a reality check on how the market works. The stock market is everywhere. Stock is sold here, there, all around the world. To limit the seed capital exemption to a very specific set of sales in a very specific place essentially moots it. It — it writes in a limitation that is very carefully left out of this Texas and this Federal exemption because it's just not practical. You just can't — can't do anything with it that way. It becomes a small — All I did is if every other State had a different rule, but Texas says don't worry about any of those rules, any issuer in any State in this country henceforth can sell their shares on this market without worrying about any registration or anything else. That is Texas extending its regulatory authority throughout the country and overriding New York law, Mississippi law, everybody else's law. But two things could happen there. The Federal government could pass a regulation as part of 504 that says any qualifying State exemption except for one that has any extraterritorial effect. It didn't do that. It left that issue to the State. But it's a choice of law issue. The parties agreed to it. And my man owns millions of dollars of real estate in Texas. He is a Texas businessman. He's spent millions of dollars getting his floodplain restored. He's got a business there. It engages in stock in the State. But if the question is, is there some connection by T.J. Management and Mr. Callen to Texas, which is the foremost question, that we are — is he a stranger to the State? He absolutely is not. He was a Texas businessman before he ever heard of this. And for a Texas businessman to then expand that business and use the law of the State where he is, is not a great reach. It is not an expansion of Texas' sovereign power. It is a choice of law issue being engaged in by a Texas resident, and one that the Federal government could but chose not to, and recently reiterated again, that free trading shares resulted from qualifying State exemptions, and it knew exactly what the Texas exemption was when it made that statement to the markets not two months ago. Can't be yes and no at the same time. And we can't read words into these regulations in the Securities Act that aren't there. Well, what's the word that's missing from B-3? In other words, B-3 says — I have two questions. Well, you have time — I still have two questions, but one of them is, the way you interpret B-3, it seems to me, would swallow up B-1 and B-2, number one, because everybody who trades in penny stocks would relocate to wherever they could get the benefit of the regulations, sort of like Judge Southwick was saying. And second is, what is the flaw in their interpretation of B-3? Well, there are a number of securities regulations that govern specific situations that have long histories. Let's look at — Could you come back to the microphone? This is being recorded. Could you come back to the microphone? It would — I ask. Nowhere does it say limit. It says, according to what is the substance, the State law exemption, and then what limitations are placed on that. Do they permit general solicitation and advertising? Yes. So long as they're made only to accredited investors. Check. Those are the constraints. It does not go on to say, and so long as those States — those transactions occur only in Texas, or the issuers are only in Texas, or any such thing. Exclusively. Their word is exclusively. As were these. This was the law. We didn't do it for Texas and Virginia or Texas and a whole bunch of other things. We chose Texas law and subjected ourselves to the ins and outs of the Texas exemption. Okay. Well, we — yeah, I'm afraid your time has run out. Ms. Harden. Good morning, Your Honor. Tracy Harden on behalf of the SEC. We appreciate your flexibility in being here today, despite the changes in the situation. We're always happy to be present to answer the Court's question to the best of our ability. I will touch very briefly on the accredited or investor issue, just because opposing counsel started with that, and only to say, as the Court has noted, that that is an independent ground on which summary judgment can be upheld here. And the summary judgment record itself did not, in fact, have this evidence that they point to now to prove their accredited investor's status. Well, you can't really — that's a sham. He's a rich guy. You wouldn't go after him if he weren't a rich guy who could afford to pay millions back. Well, Your Honor, a couple of things. First — Let's not — just move on. I'm sorry. That's fine, Your Honor. Well, don't move on yet. I have a question about that. I don't quite agree. It's a sham. But let me ask, is he at least correct from your viewpoint that it affects the penalty? Doesn't it show that he was acting under, you know, stronger evidence? He was acting consistently with his understanding of the law, and he was an accredited investor, and the only real issue on whether he was trying to comply with the law is the other point? Or the other point? Well, Your Honor, there are a number of factors that go into the remedy. Certainly, as you say, there are a number of other bases to find that this wasn't an inadvertent violation on his part. But in addition to that, the Court looks to any number of factors in deciding whether to impose an injunction or a petty stockpile, including the recurrent nature of the violations. We're talking about billions of shares of penny stocks over several years. And so there are other bases, but you are right that if this was the only basis on which a violation was found, that would be relevant to the remedy's determination. But to move to what I think is the more substantive or one of several more substantive reasons why this wasn't inadvertence and just a technical violation or procedural problem of not submitting the evidence, as the Court has focused on, the terms of 504B13 specifically say that transactions have to occur exclusively according to the terms of State law exemptions, exemptions plural. And given that State law exemptions can only apply within their borders, the Supreme Court has told us that, and Edgar B. Might and other cases cited in our brief, the only way to comply with that requirement would be for the offers or sales to occur in the jurisdiction in which the exemption applies. But what does that mean in this context? The opposing counsel was trying to say that this is not a real world reality. I don't know physically what it means to be selling these securities. Do they literally occur in a single State in the view of the SEC, such that you could say that Texas Securities, a Texas company selling securities, is selling them within the State of Texas, even if the purchaser is someplace else? Well, the question of where the offer or sale occurs actually is probably a question of State law. But the issue here is that it is the appellant's burden to prove that the exemption applies. And there's no evidence showing where these transactions occurred. The only evidence we have, in fact, points to the possibility that they occurred elsewhere. Well, let me ask you . . . let me probe that a little bit, because in your motion in the district court, you had a list of the companies that he dealt in, and you have a footnote where they were incorporated. And you are not contending that any of the underlying stocks had to have had a registration statement, correct? In other words, My Vintage Baby was in Texas, and it was under the Texas exemption, right, from registration. You said that none of the stocks had registration statements. So I interpret that to mean that he was at least buying stocks that were validly not subject to registration statement. Well, I think that's . . . he purports to have complied with the Texas State law exemption. I'm not asking that. I'm saying he was . . . because if it was a Nevada . . . if the stock was exempt in Nevada, then as I understand your . . . and maybe I have a fundamental misunderstanding, but if the stock was exempt in Nevada, my understanding is that the issuer of the stock could sell it to person A, B, C, and that person could resell without having to prepare a registration statement, right? That's actually not the case, Your Honor, and this is another independent issue that we've raised in our brief. The face of Reg D in Rule 500D specifically says that the exemptions there under are only available to issuers. They are not available to any person for resale, and that applies here. But I thought that the whole point in making the market . . . I was trying to conceptualize it in my mind because I thought the whole point of making the . . . clearly there was a preexisting market for these shares. Where did the market exist? I mean, he's not selling into . . . he's not making the market. He is selling into a market that is preexisting for Good Life China, for Viper Industries, for Atlantis. Where is that market? Is that the Chicago? Is that the OTC market? Is it New York? Where's the market? The distinction here, I think, Your Honor, is between the characteristics of the securities themselves and sort of whether they're restricted or unrestricted, and then whether a transaction is exempt. Ordinarily, you are right, your average investor can resell securities in the secondary market without any registration requirements. The reason they can do that is not because Section 5 or the registration requirement doesn't apply. It's because they're in 4A1 of the Act for resales not by an issuer, underwriter, or dealer. The problem that Mr. Kalin and TJM have here is they were acting as an underwriter in these transactions. Well, then why didn't you just charge him with being an underwriter? Because to me, the gravamen of your charge was that he was somehow purchasing unregistered securities and he couldn't resell them. And so now what you, in other words, as I read the Bronson case, that was B1 and B2, and the theory there was essentially that he was selling not to an underwriter because there was a requirement that you sell to an institutional investor, and he said his right hand was his institutional investment company, correct? Well, to be clear, Your Honor, we did raise the underwriter issue below, and that's in our summary judgment papers where we talk about the fact that there isn't an ability to resell these securities without a separate exemption. But it is true that in order for even his theory of the exemption to apply, Rule 504B13 had to be complied with in the initial set of transactions where he purchases these securities from the issuer. His argument is, when I get these securities from the issuers pursuant to 504B13, they are, quote, freely tradable and I can go trade them without worrying about the registration requirements. That's simply not true. Well, why is it not true? Because what every transact, to back up, every offer or sale of securities in interstate commerce has to be either registered or exempt. And it's the transaction that has to be registered. You don't exempt securities. What the appellants are pointing to is the distinction between restricted securities and unrestricted securities, or so-called freely tradable or freely transferable securities. And that has to do, essentially boils down to, really, the issuance of the securities with a restrictive legend that hampers their issuer in a chain of transactions. Don't tell us the whole law. Just tell us what the facts are here. These were unrestricted securities. They were unrestricted securities. Unrestricted securities, nonetheless, can only be sold in transactions that are registered or exempt. Ordinarily, unrestricted securities are very easily resold, and this isn't a problem, because of 4A1, because resales not by an issuer, underwriter, or dealer are exempt. So the only difference between a proper sale and an improper sale was the volume? Is that what you're saying? No. What I'm saying is the problem with the resales here is that Mr. Callan and TJM were acting as underwriters, which it doesn't turn on volume. Well, all you say in your briefing about underwriter is that you can be an underwriter, but you don't define underwriter. That was not what the district judge ruled on, as I understand it. That's right, Your Honor. The district court focused on the applicability of Rule 504 to the first set of issuer transactions, because if that doesn't apply, his theory falls apart regardless of the resales. But the term underwriter, and I apologize, I thought that we cited this in our brief, is a defined term under 2A11 of the Act, and it is somebody who takes securities directly from the issuer with a view to distribution. So this turns on whether he had a view to distribution. Often that's a difficult question because you look at intent. To solve that, courts have looked at objective factors like how long the securities are held, whether there was a change of circumstances. I mean, I'm not saying that this is an ultimately unfounded action, but I do think that it suffered because you basically filed a fifteen-page motion for summary judgment in the district court, twenty-page, excuse me. There was no trial, no oral argument. The district judge just basically copied the Bronson case, and the facts here are not the same as the Bronson case. And we're off to the races, and in a very, what is to me at least, a very complex area of the law. I take your point, Your Honor. I will say that part of the problem may have arisen from the fact of the way Section 5 violations proceed. Well, there aren't many cases. There aren't many cases on those other than pump and dump, right? There are. A lot of them also contain pump and dump allegations, but there are stand-alone Section 5 cases, and certainly it's a strict liability violation. You don't need sort of the fraudulent representations you ordinarily see in pump and dump. I'm sorry, but we didn't find many reported cases on this other than pump and dump and Bronson, so maybe they were SEC enforcement actions. There are some administrative cases, commission opinions, but I think, you know, the applicability of B-1-3 itself, you're right. There are not a lot of reported cases on there, and sort of the fact that you need to show that the offers or sales at issue take place in the jurisdiction in which the state exemption applies has only really been litigated in this case, but it flows directly from the terms of subsection B-1-3, again, exclusively according to state law exemptions. And what do you do with his defense that he relied on statements of counsel, opinions of counsel throughout? And he was dealing with a whole bunch of institutional-type purchasers on the other side, so do you think, I mean, what were their rights vis-à-vis these securities? If he's liable, why isn't Goldman Sachs? Well, a couple of points, Your Honor. First, it's very clear and well established in the law that this is a strict liability violation, so good faith reliance on counsel, mistake of law, it does, you're right, Your Honor, it goes to remedies. And the point I would make there is there were misrepresentations made in the documentation of these transactions. Are you saying he misled his attorneys? I'm saying that the subscription agreements he signed, which are what traveled with these transactions through the attorneys issuing opinion letters and through the brokerage houses, did not document the reality of the transactions. He specifically represented that he took these with investment intent and not with a view to distribution. A view to distribution is a well-established concept under the securities laws. Distribution is the chain of transactions that gets securities in the first instance from the issuer to the public. Well, in this context, and I don't want the whole background, I mean this context, suppose this was my vintage baby in Texas, he buys 5 percent of the stock, he then, and he keeps 2 percent, and then he sells 3 percent. What is wrong with that? A couple of things, Your Honor. What makes him an underwriter? Because the law just, the transaction is supposed to be exempt if this occurred in Texas, and then what does an eye to distribution mean? Does that mean that you can only sell those securities again in Texas? No, because there's a market. No, but distribution, again, the concept of distribution, there's well-established law of what that is. It doesn't depend on volume of sales. What it depends upon, and it doesn't depend upon the location of the sales. But in other contexts, aren't there holding periods? I mean, the SEC has at least told people that you can hold the stock like after an initial offering. I know very little, but I, you know, you can hold the stock for an X amount of time, and then you can resell it without having to be called an underwriter, right? That's correct, Your Honor. But there's nothing like that to clarify the law here. Well, but the concept of a distribution is precisely the same throughout the securities laws. I think what you're referring to is Rule 144, which is a safe harbor for something not to be considered a distribution, and therefore you're not an underwriter. If you look at Rule 144, at the very beginning, at the preliminary note, it explains this quite explicitly. And what the preliminary note of 144 tells you is that distribution depends upon the intent of the purchaser when they buy. That is a difficult thing to prove quite often. So what the factors courts looks to and the Commission has looked to are the length of time in which you hold it, or whether there's, for example, a change in circumstances between the purchase and sale. So I bought these. I provided seed capital. I'm an angel investor. I want to invest in this small business. I'm going to provide seed capital and wait and see how they do. The next day, my kid gets into Stanford, and I have to pay tuition, and I need to liquidate assets. That's the kind of thing that might show you didn't purchase with an intent to distribute. But here what you have from Mr. Kalin and TJM is their expressed intent to sell these securities as soon as practical, as soon as market conditions were favorable. And, in fact, what they did is sell them within days or weeks. There are cases in which view-to-distribution is difficult to wrap your heads around. This is not one of them. This is a classic. Does this rule apply to a typical day trader who is in and out of the market, you know, sell, buy at 10 o'clock and sell at 3 o'clock or whatever? Not typically, Your Honor. And the distinction there goes back to whether you are in a distribution, the chain of transactions from the issuer to the public in the first instance, the primary market. Once securities have come to the public market, then ordinary resales are, in fact, covered by 4A1 and can be sold without any concern for an exemption. What is it about the penny stock that makes it different? No, the difference is because he took these directly from the issuer, and so he is a part, he's a link in the chain from the issuer to the public in the first instance. And that's what an underwriter is. You know, the other piece of the underwriter definition is taking from the issuer. But Bronson is the only other published case that might arguably involve this concept, right? And I realize you're here, you know, on short notice, but maybe you can cite us a couple more cases about this, but . . . Well, I want to be clear on what the Court is looking for precedent on. Bronson is the only other case about 504B13 . . . Yes. . . . and whether that applies. This is B13. I mean . . . That's correct, Your Honor, but I want to be clear. Even if B13 applies, the resale is not exempt. B13. Published cases on B13. I think we're going to be left with Bronson and this case. There are a couple of other district court cases which are cited in the briefing below and in our brief that have involved B13, but they don't really delve into this issue. But if what the Court is looking for is authority for the proposition that the sales of unrestricted securities, assume he took them correctly under B13, need to be exempt or registered, there's no shortage of authority on that. I think we can start . . . That is because you're saying of 4A1. That's correct. And that's what's been . . . But that's not what the district judge ruled on. It's not what the district court judge ruled on. You're correct. It was argued below. It is an independent grounds to affirm the summary judgment here in the sense that it is well established and uncontested on the undisputed facts. I would also point the Court to the beginning of the seed capital release. That's the 1999 release that actually adopted B13 where this is very explicitly laid out. What the Commission said there is 504 exemptions are only available to issuers. They're not available for resales. That any resale needs to be registered or exempt and that anybody who takes 504 securities with an intent to distribute or with a view to distribution is an underwriter and risks Section 5 liability. That is precisely what happened in this case. I'm sorry, but I'm going to have to ask you a couple more questions. The first one is they focused quite a bit on the amended rule that came into effect. Did it materially change the legal status of what occurred here? Not at all, Your Honor, and for several reasons. First, I do want to make a procedural point that that release was actually issued in November 2016, so any arguments flowing from it were available prior to the opening brief in this case which was filed in December. He did argue it. He argued it in his reply brief, Your Honor, and the January date he focuses on in his reply brief is when . . . You say it's not material, so I'll accept that, but we can look it up if we think it's . . . It doesn't change any of the material terms of the rule. All it did was increase the offering limit from 1 million to 5 million and add bad actors. But I do have two questions about the proposed remedy, and one of them has to do with your idea about what you call gross profits, which is clearly gross revenue, right? Gross revenue, not gross profits being the measure here. The second one being the lifetime ban on trading in penny stocks because penny stocks are anything valued at $4.99 or less, and you can trade in a stock that's trading today at $6 and tomorrow it can be down to $4. Is that an improper and net? Okay. I'll take the penny stock bar first, Your Honor, and I will point out that that bar, if you look at the final judgment in this case, it's not a lifetime ban on any trading. This is specifically delineated in Section 20 of the Securities Act, which gives the authority for a penny stock bar, and it is a bar in participating in the offering of penny stocks. The offering of penny stocks is then defined in the Act, and that language is reflected in the final judgment here, which is engaging with a broker, dealer, or issuer for the issuance, trading, or encouraging the purchase of penny stocks. So the idea that I can trade in nonpenny stocks and they drop in value and all of a sudden I'm in violation of the terms of this bar just doesn't appear to be covered by that and found in contempt on that basis is far-fetched, to say the least. And then with respect to the offset that was argued for in this case for business expenses and fees, I want to remind the Court that we are talking about a discretionary remedy, and the question for the Court is whether this was an abuse of the judge's discretion. As the district court noted . . . I mean, I really think when you're talking about millions of dollars in disgorgement, I don't care whether it's Ken Lay or the guy down the street, you would think that the judge would at least let him appear and make some argument. I can't speak to the Court's decision as to whether to hold argument. I will point out that the amount of disgorgement here, the calculation of $7.7 million in ill-gotten gains is not in dispute, and the only arguments were . . . The entitlement to the offset. Right. Right. And had the judge heard oral argument, he could have heard that there was no other case in Bronson that dealt with the B-1-3 exemption. He might have gotten as confused as I have been about exactly what transactions you were saying were the illegal ones, and he might have said, hmm, let's give this guy the benefit of the doubt, a thousand acres or a hundred acres of land in Dallas is not a small amount. Maybe, you know, maybe we ought to deduct something for his claimed attorney's fees or whatever. He didn't have to assess the entire amount of gross revenues. You're right. He didn't have to, but nor was it in the abuse of discretion to decline to do so here. As the district court noted, the overwhelming weight of cases looking at this question have found that it's within the unfair here, Your Honor, when what we're talking about is the entirety of his business involved running these illegal transactions. It's not a tangential violation. I understand that, but this is . . . frankly, this is a speeding light violation because every trade he's making is into an established market. Right? There has . . . where is the market? Is it in Chicago? Your Honor . . . There's not an allegation of fraud at all. You're right. There's not an allegation of fraud. I want to push back a little bit on the idea that this is a well-established, well-organized market. We are talking about penny stocks here. Penny stocks are typically traded over the counter without the ordinary gatekeepers of an exchange with listing requirements and information. We are, by definition, talking about gamblers. Well, but . . . Either sophisticated investors or investors who know the risk at least know some . . . I'm just saying that had the judge had . . . it just looked too easy, the way the judge handled this. Maybe my colleagues will disagree with me, so I don't want to waste your time. I see my time is up, and I will just conclude with the idea that the penny stock market is, in fact, a market where the information provided to investors by registration is particularly important. You're talking about, as I said, transactions over the counter and issuers that are either new and untrusted or distressed. I mean, that was my other thing. There must have been a market for all these particular stocks that he traded in. Was there not? They were traded over the counter in penny stock trade, so it's not an exchange. These are not exchange-traded securities. These are not. So somehow somebody complied with B1 or B2, and they got into the market, and then anybody could buy and sell them. Is that right? Well, remember, the exemptions apply per offering, and so I don't know what types of offerings were used for the preexisting securities. What we're talking about is the batch of securities that he took from the issuers in each of these 155 transactions. And so each offering has to be registered or exempt. They can be registered or exempt in different ways. So we don't know that they were all B1, B2, B3 offerings. Thank you. I'll speak to two questions raised in the earlier argument and then turn to this issue of underwriter status. Judge Jones, the answer to your question about the role of B3 compared to 1 and 2 and looking at the regulation again, B3 contains the limitation to accredited investors, relatively sophisticated investors, which does not appear in 1 and 2. So they have different baskets of sticks, and that's a pretty significant stick distinguishing those. Second, this question as to the market, a good place to look for the definition we cited this January report in our reply briefing. It in turn cites this October report. It's the workup that a regulatory agency must do in the course of promulgating new regulations. Beginning at page 86 and going on for a while is the economic analysis of the new regulation as required by law. It goes on for page after page after page. Is that in the record? It was cited in the reply brief, Your Honor, because it was part of the new enactment of regulation. We cited the January report and this, and we quoted from both of them and have the link to where it's available on the SEC website. I mean, what do the new regulations have to do with this case? Well, there's not the new part. There isn't a new part. It's the restatement of them and what they said about them. Like, for example, here, where they talk about the economic effect. There's not one word in that economic analysis of the regulation as reiterated and expanded that talks about limitation to Texas or to any state. It talks about aggregate dollar amounts of all of the transactions done under 504. It gets rid of 505, which required, which did not result in free trading shares. And it says we need more of this. There's no word in the economic analysis on the geographic section. We're not saying there's some get-out-of-jail-free card we got as a result of the new regulation. What we are saying is the facts of this case cannot be reconciled to what the SEC says about the new regulation and the support for it in terms of the economic impact that they hope it has. With respect to underwriter status, what that regulation is talking about, those rules are talking about, is the big investment banking house. Some and so goes public. The underwriter gets it. It sells it to the public. It assumes no risk because there's a presale. It's going to get the stock. It's going to turn it around. It's going to sell it. You see the ads in the journal all the time. What case says that? There's some briefing about this in the district court, but it's because it doesn't become a big issue on appeal. But that's just the definition. That's the fact pattern. And if you look at the regulations and authorities about it, that's what it deals with. Let me just illustrate the flip side of that, which is the language in the State regulation that says investment intent. That just means you're trying to make money. You have to be able to sell things to make money. The commission's argument that intent to resell necessarily makes you an underwriter makes anybody who plans to sell securities an underwriter. Kennedy. But you also say it is the standard measure of what the intent was and whether you're buying for distribution is the fact pattern of how quickly you do that. And it seems to be, are you disputing that that is the standard measure of determining whether you are an underwriter or not? Well, it's — I'm suggesting that there's different factors to look at. But practically, what those are talking about is the difference between the underwriter that assumes no risk and the gambler, as Judge Jones puts it, that assumes all the risk. He's got no presale. The market could die. The proof undisputed in this record is he took 100 percent risk, and this stock fluctuates 50 percent on an hourly basis, daily basis. He took that risk with no guarantee he could get it back. That's not underwriting. Well, the fact he may have taken a greater risk doesn't exempt him from the rules. It seems to me that the whole purpose of this is that the initial purchaser from the issuer is either an underwriter or somebody buying on a more general market. And so it seems to me that even though the district judge didn't get to it, it still seems to me a quite plausible view of what your client was as an underwriter. You're an underwriter or you're an investor. And both of them sell stock. That's what the commission says. Both make sales. He couldn't sell his stock. He just needed a registration statement. But that's the whole point of this is we've got free trading shares. She says they must be registered unless otherwise exempt, and that's her point, is there's an exemption. Where did the idea come from that the registration requirement extends? That's the SEC's argument. That's not what the exemption says. Isn't the whole case about whether the exemption applies? Yes, and it applies. That's the whole case, isn't it? It applies, and if it does, it's free trading shares and we can sell it. And the reason we're trading fast is the market moves bing, bing, bing, bing, bing. It's like a pinball machine. It's not the New York Stock Exchange. You have to move quickly when you see opportunity. Fast could be a week. We hold a little bit here, a little bit there, a little bit the other way. Admittedly, it's a fast-moving market. But there's no timing requirement the other way. There are timing requirements for how long an underwriter must hold stock. There's no such requirement here anywhere in any of these exemptions. How long does it have to be? It's a fast-moving stock and highly volatile securities with a man who assumes all the risk. That is not what an underwriter is intended to be. Do you have any observations about the remedy? I think that the issue of disgorgement that the Court summarized as revenue versus profit, I appreciate there are cases out there that have required disgorgement of revenue. That's astonishing to me, given general principles of restitution. My client had significant expenses, lawyers, dealing with houses, operating, and he made profit. It's not fair. The Supreme Court just dropped a footnote about disgorgement. Well, I'll should... In the case where that dealt, yes, she's aware of it, dealt with the statute of limitations in SEC. And there was a very pregnant footnote that Justice Sotomayor had about the SEC's power to request disgorgement. That might have been in civil actions or civil... It's certainly sweeping power. But the principle of equity that it rests on is one that should be applied fairly, and it is not ordinarily applied in that way in the law of remedies. And the other comment I would have as to remedy, Your Honor, is the Court, as observed, and we're in this circuit because there's a Texas connection. My vintage baby is where this got started in the Plano division. So there are transactions here that involve Texas. If the Court approaches the exemption in such a way that it finds some sort of Texas limitation to be a relevant part of it, there would certainly be a need to go back and restructure the remedy to factor that into consideration. Well, had you made that argument before? I was wondering. I've asked people to look at the brief in my chambers. Is any argument made that at least the Texas stock should be pulled out or has it already pulled out? You have not made that argument, have you? I mean, that's one of the things. We're here to try to figure out what's wrong. And getting these new arguments here, getting them in the reply brief is not the way that we operate. So just answer the question. I'm sorry. I'm rattling on. The question, did you make the argument before that there's anything wrong with looking at how this calculation was made? You either win or you lose. It's not that it should be 6,000,005. Well, there is evidence in the record of what our property is. I'm not asking about the evidence. I'm asking about the argument that you've made. We clashed directly with this notion that disgorgement should be our full. Okay. It should be our full revenue. I mean, we clashed. It's like two or three pages there towards the end. I don't know if the exact number to the penny is there, but that proof is there, cited. Yeah, but did you go through the transactions and pick out the ones that had Texas We did not make that argument. I was responding to the discussion that the Court had earlier. Judge Jones asked what could happen if the Court ruled in a way to create law that I don't think was there. That is something that could happen and would be, I think, necessary. I think we've exhausted the subject. Thank you. The Court will stand in recess. All rise. The Court is adjourned.